UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

FRANK G. MAYBORG, et al.,        :
                                 :
          Plaintiffs,            :    NO. 1:04-CV-00249
                                 :
                                 :
     v.                          :    **FINDINGS OF FACT,**
                                 :    **CONCLUSIONS OF LAW**
                                 :    **AND ORDER**
CITY OF ST. BERNARD, et al.,     :
                                 :
          Defendants.            :


This matter is before the Court for decision following a
bench trial conducted on October 4, 2006, and continued until
October 24, 2006.  In rendering its decision on this matter, the
Court has considered the testimony of the witnesses, the documents
admitted into evidence, Defendants' Stipulation of Fact (doc. 36),
Plaintiffs' Proposed Findings of Fact and Conclusions of Law (doc.
37), Defendants' Proposed Findings of Fact and Conclusions of Law
(doc. 38), Plaintiffs' Proposed Rebuttal Findings of Fact and
Conclusions of Law (doc. 42), and Defendants' Supplemental Proposed
Findings of Fact and Conclusions of Law (doc. 43).  For the reasons
indicated herein, the Court ENTERS Judgment in favor of Plaintiffs
on Counts One through Five of their contract and federal
constitutional claims, and CONTINUES this matter for a hearing on
damages.

In weighing the testimony of the witnesses, the Court

evaluated the credibility of each witness, their interest in the outcome of the trial, their manner of testifying, and the extent to which such testimony was supported or contradicted by other credible evidence.  Under Fed. R. Civ. P. 52, the Court has set forth its findings of fact and conclusions of law, below.

The decision rendered today follows a long and difficult dispute between the City of St. Bernard and its retired employees. The Court notes that both sides have been represented by very competent and well-prepared attorneys, who presented their cases well and acted in accordance with standards of professionalism and civility.  The Court was further impressed with the sensitive position of the City of St. Bernard's law director, who took a position in the case adverse to the interests of his own father, a retiree of the City.  In light of the nature of the case, it is to the credit of all parties that the trial on the merits proceeded in the spirit of cooperation.

## I.  Introduction

In May 2003, the City of St. Bernard (hereinafter "City") informed its retired employees that it was suspending certain retirement benefits because of a legal opinion that payment of such benefits was illegal under Ohio law.  In the Defendant City's view, "no public purpose is served by the extension of benefits to already retired employees, and therefore such benefits are illegal and public money cannot be expended for such purposes" (doc. 27).

2

Plaintiffs Frank Mayborg and Kenneth Davis, retired City police officers, Plaintiff Forrest Hudson, a retired City fire-fighter, and Plaintiff Terrance Hawley, a retired City service employee, filed suit in April 2004, alleging the City, the members of City Council, and the City Law Director unlawfully revoked and impaired their vested rights to the benefits they had been receiving and expected to receive from the City in exchange for their years of service to the City (doc. 4).  On September 29, 2004, the Court certified the case as a class action, and defined the class of approximately 185 retired employees as:

> All individuals formerly employed by the City of St. Bernard and who retired from the City of St. Bernard and have received certain retirement benefits from the City of St. Bernard and/or their surviving beneficiaries entitled to those retirement benefits (doc. 16).

During the course of the trial it became clear that there are three subgroups of retirees: 1) service department employees who qualified for the City program after becoming eligible to retire under the public employees retirement system ("PERS"), 2) police and fire retirees who retired prior to July 1, 1992, and 3) police and fire retirees who retired after July 1, 1992.

Plaintiffs' Amended Complaint asserts claims for (1) violation of the contract clauses of Article 1, Section 10 of the United States Constitution, and Section 28, Article II of the Ohio Constitution, (2) an illegal practice of denying and/or substantially interfering with vested retirement benefits, (3)

3

denial of Plaintiffs' civil rights without due process, pursuant to 42 U.S.C. § 1983, (4) denial of Plaintiffs' substantive due process, (5) breach of contract under state law, and (6) promissory estoppel.  Plaintiffs dropped a claim for violation of ERISA, and subsequently asserted three new claims in their proposed findings of facts and conclusions of law, which were neither listed in the Amended Complaint nor the final pretrial order: for breach of fiduciary duty, unjust enrichment, and for violation of the moral obligation doctrine (docs. 42, 43).  Plaintiffs seek an injunction to restore the benefits, damages relating to the suspension of benefits, and attorneys' fees.

Defendants contend 1) Plaintiffs have no federal cause of action, 2) the state law claims should be dismissed for lack of jurisdiction, 3) the benefits as originally granted were illegal under Ohio law, 4) the benefits at issue were not vested, and 5) promissory estoppel is not applicable to municipalities performing governmental functions, under the Ohio Supreme Court's recent decision in Hortman v. City of Miamisburg, 110 Ohio St. 3d 194, 852 N.E.2d 716 (Ohio 2006).  Defendants further argue Plaintiffs' claims asserted in their Rebuttal Findings of Fact and Conclusions of law, for breach of fiduciary duty, unjust enrichment, and for violation of the moral obligation doctrine, should be dismissed under Moore v. Fenex, Inc., 809 F.2d 297 (6th Cir. 1987).

The core issue in this case is whether Plaintiffs were

unlawfully deprived, in violation of the Constitution and/or state law, of vested rights they had in retirement benefits, or whether Defendants are correct that the benefits were illegal. Resolution of this question is determinative of Plaintiffs' claims.

## II. Background and History

The facts of this case are long, and in some respects dense. Therefore, the Court finds it appropriate to briefly summarize the historical background prior to enumerating its findings.

Prior to public employee collective bargaining under Ohio law, with the enactment of Ohio Rev. Code § 4117 in 1984, the City and its employees would negotiate wage and benefits and then embody the agreement in the form of an ordinance. The starting point for this case is the year 1961, when the City established by Ordinance No. 4-1961 no-cost enrollment in the City's health care program for qualified employees. In order to qualify for the program, employees had to have completed five years of service and be eligible to retire under one of two state pension programs: the state police and fire program, or the public employees retirement system ("PERS"). From the inception, the City reimbursed PERS participants for the cost of premiums, while the state police and fire program had no premiums. According to Plaintiffs, these original benefits of no-cost medical insurance coverage were hard-fought through negotiation with the City, and were granted by

5

ordinance in exchange for their employment with the City. According to Defendants, these original benefits were only applicable to the narrow class of "present active employees" as of the year 1961, under the express language of the Ordinance.

In January 1985, the City learned that its insurance coverage overlapped with state pension medical insurance programs, and therefore that it could save money, approximately $130,000.00, by repealing all overlapping coverage. The City therefore enacted an Ordinance authorizing the Auditor "to discontinue any medical coverage where there is coverage provided by the State of Ohio pension funds and systems." In Defendants' view, the 1985 Ordinance cancelled all prior ordinances; while Plaintiffs view this as merely a change in the mechanism meeting the City's enduring 1961 commitment.

In June 1985, the City passed Ordinance No. 24, 1985, noting in the preamble its previous action in terminating overlapping coverage, and directing the Mayor to execute a trust fund in accordance with Section 501(c)(9) of the Internal Revenue Code (hereinafter "C-9" Trust). The purpose of the fund, on its face, was to reimburse qualified City retirees for costs not paid for by the state insurance plan. At the trial, the parties indicated that the sorts of benefits at issue were physicals or prescription costs above the state allotment. Defendants argue that the 1985 Ordinances were illegal extensions of retroactive

6

benefits to already retired employees; Plaintiffs view the ordinances as adopted to preserve the status quo of no-cost health benefits for retirees. In 1985 the City also passed Ordinance 25, 1985, to ensure premium reimbursement for service department employees retiring under PERS.

In 1986, the City and its employees completed their first collective bargaining agreements. Such agreements included negotiated terms for C-9 benefits. Subsequent agreements continued to do so, and those applicable to service employees included premium reimbursement.

In 1992, the state police and fire-fighter health insurance changed such that retired police officers and fire-fighters had to start paying a premium, similar to that which service employees had been paying under the PERS system. The City passed Ordinance No. 49-1992, granting retroactive reimbursement to qualified city police and fire-fighter retirees who had retired prior to July 1, 1992.

## III.  Findings of Fact

Having summarized the general background, the Court now proceeds to its more detailed factual findings:

1.   Pursuant to Ordinance No. 4, 1961, the Council of the City of St. Bernard promised its present active employees at the time of their retirement, hospital and medical insurance coverage similar to that presently furnished by the City to members in

active service, provided that the employee completed five years of continuous active service immediately preceding retirement and was eligible for retirement benefits under either PERS or Police and Fire Pension Fund. (Plaintiffs' Exhibit A).

2.  The Retirees have offered evidence that then current employees of the City received the benefit upon retirement.

3.  The City has proffered no evidence that pre-1961 retirees received a benefit they had not earned.

4.  The practice of the City has been to provide this benefit of no cost health insurance upon retirement to all City employees.  Mr. Walter St. Clair, Auditor for the City, has acknowledged that the City has had a history of providing no-cost health insurance to its retirees.

5.  This past practice is evidence of the City's original intent to provide this benefit prospectively to its current employees.

6.  Plaintiff Frank Mayborg, a retired patrolman from the City's Police Department, described the wage and hour negotiations with the City prior to public employee bargaining.  Members of the Wage Committee of the Fraternal Order of Police, composed of two patrolmen and one supervisor, would negotiate with the Finance Committee of City Council.  Once agreement was reached between the two committees, the Wage Committee would present

the proposed contract to the rank and file members of the Fraternal Order of Police. Following an approval vote of the membership, the Wage Committee would report agreement to the Finance Committee. The Finance Committee would then report the agreement to the full Council. The Council would then memorialize that agreement in an ordinance.

7. Mr. Mayborg testified that during the almost twenty-two years he served on the Wage Committee, he regularly raised retirement benefits in wage negotiations with the councilmembers on the Finance Committee. He testified that councilmembers on the Finance Committee repeatedly assured him that the City would continue to provide no-cost health insurance to retirees, because the City "takes care of its own".

8. The City has a history of substituting the means of delivering the same benefit to its employees and retirees. See, e.g., Ordinance No. 4, 1961.

9. Pursuant to Ordinance No. 46, 1984, the Council of the City of St. Bernard substituted medical insurance coverage to its retirees where there was coverage provided by the Police and Fire Pension Fund and/or PERS. The Council stated in the preamble of the Ordinance that the Police and Fire Pension Fund and PERS were providing the same medical coverage at no cost as was being provided by the City. (Plaintiffs' Exhibit

9

G).

10. In exchange for the substitution of the hospital and medical insurance provided through the statewide pension systems, the City passed two ordinances intended to offset the added costs to retirees to assure the delivery of the no-cost health insurance retirement benefit.

11. Pursuant to Ordinance No. 24, 1985, the Council of the City of St. Bernard established a fund for the purpose of reimbursing qualified City retirees and their dependents for the health care costs they incurred which were not paid by the health insurance provided by either the Police and Fire-fighter's Pension Fund and/or PERS. Pursuant to Ordinance No. 24, 1985, the Council of the City of St. Bernard directed the Mayor to establish a C-9 Trust. (Plaintiffs' Exhibit I).

12. The C-9 Trust was not a new benefit for retirees of the City, but rather continued the no-cost hospital and medical insurance benefit retirees had been receiving from the City. In addition, the C-9 Trust, by its express definition of "employee," was intended for current retirees as well as current employees upon their meeting the eligibility criteria and retiring from City employment.

13. Mr. St. Clair testified that the C-9 Trust Fund was intended to substitute one type of benefit for another type of benefit retirees had been receiving. The City offered no evidence to

rebut that testimony.

14. In addition to the added cost for medical coverage under the pension sponsored insurance, the elimination of the City sponsored health insurance had an added premium cost for retirees eligible under PERS. Specifically, the City's substitution of healthcare insurance coverage provided by PERS required eligible retirees to pay a premium differential for the same healthcare coverage.

15. At the Committee of the Whole on August 13, 1992, Mr. Ed Geiser, Sr., Auditor for the City of St. Bernard, explained to the Council that changes had taken place in the Police and Fire Pension Fund. (Plaintiffs' Exhibit R). Mr. Geiser explained that medical benefits were no longer "cost free" to these retirees and their dependents. (Plaintiffs' Exhibit R). Mr. Geiser explained to the Council that the cost of the insurance would be deducted from their monthly pension checks as of July 1, 1992, unless Council elected to reimburse these costs. "After discussing the matter, Council agreed 7-0 to prepare an ordinance to cover the insurance costs for those employees, retired prior to July 1, 1992. It was the unanimous feeling of Council that these retirees were promised coverage at no expense to them and it was the City's obligation to continue this benefit." (Plaintiffs' Exhibit R).

16.  Pursuant to Ordinance No. 49, 1992, the Council of the City of St. Bernard provided those retirees who had retired prior to July 1, 1992 and who were members of the Police and Fire Pension Fund, their spouses and/or dependents with reimbursement for the monthly medical premiums deducted from their monthly pension check. (Plaintiffs' Exhibit Q).

17.  The reimbursement benefit provided to those retirees who were members of the Police and Fire Pension Fund and who had retired prior to July 1, 1992 was not a new benefit. At the Council meeting on September 3, 1992, Councilmember Weidner stated: "When the retirees did retire, they were under the idea that they were going to have this paid for. All of a sudden, the State put this on it (sic). I think that we ought to take care of the ones that did retire already." Councilmember Keller stated: ". . .historically the City has maintained this benefit for the retirees. . .if the historical perspective has been that we've taken care of this all these years, then I think that we ought to continue to do so for those families." Councilmember Hausfeld stated: "I think that when the people retired from the City, when the C-9 Trust Fund was established, they felt that they wouldn't have to worry about insurance and I think we're just fulfilling a moral obligation to the people who have retired, to continue to pay their 100% insurance. I am all in favor of passing this on an

12

emergency basis." (Plaintiffs' Exhibit R).

18. The Council did not give a new benefit to retirees who had retired prior to July 1, 1992. The comments of the Mayor, the members of Council and the Auditor demonstrate that Council was simply providing the retirement benefit which had been consistently promised to City employees, no-cost hospital and medical insurance upon retirement.

19. Mr. Carl Deutch, a retired St. Bernard fire-fighter, testified that upon his retirement from the City's Fire Department, he had available both the Police and Fire Pension Fund medical insurance and the City's medical insurance. Following passage of Ordinance No. 24, 1985, he received C-9 Trust Fund benefits and his pension medical insurance. Following passage of Ordinance 49, 1992, Mr. Deutch received premium reimbursement. Mr. Deutch's experience illustrates that the C-9 Trust Fund and premium reimbursement were not new benefits for retirees but a substitution of a mechanism to deliver the same benefit the retirees had been promised. Instead of enrolling in the City's health insurance, Retirees were entitled to C-9 Trust Fund reimbursement and premium reimbursement.

20. The City agreed to "maintain" the C-9 Trust Fund in the bargained contracts with the bargaining units for City employees. To "maintain" the Fund certainly means to keep it in a state of efficiency for the furnishing and rendition of

those benefits which are prescribed. Similarly, the City agreed to keep the Fund solvent. To keep the Fund solvent means to keep sufficient funds available to pay the benefits prescribed.

21. Mr. St. Clair and City Law Director Edward Geiser, Jr., acknowledged that the wages and benefits in the bargained contracts since the mid-1980's have been offered by the City as an incentive to continue employment with the City. Geiser conceded that payment of the wages and benefits pursuant to those bargained contracts was not giving away of public funds. Geiser conceded on cross examination that those contracts had a public purpose.

22. By the express terms of the contracts, upon retirement from City employment, Fire Department, Police Officer, and Service Department Employees had a vested right to the benefits of the C-9 Trust Fund, which the City agreed to maintain and keep solvent.

23. The City paid the premiums for medical insurance for its retirees from 1961 until passage of Ordinance No. 46, 1984. (Plaintiffs' Exhibit G).

24. The City has paid C-9 Trust benefits to eligible retirees since the adoption of Ordinance No. 24, 1985, June 7, 1985.

25. Although the City did not set up a separate trust fund, the City has established a restricted fund from which Trustees of

14

the C-9 Trust could authorize reimbursement of the eligible medical costs.

26. The City has not vetoed, disapproved or refused to pay any expense approved by the Trustees for reimbursement.

27. The City has paid the premium reimbursement benefit to eligible PERS retirees since the adoption of Ordinance No. 25, 1985, June 7, 1985. (Plaintiff's Exhibit J).

28. The City has not vetoed, disapproved or refused to pay any premium reimbursement benefit to those retirees.

29. The Business & Industry Committee of the City Council has concluded that "there is no cut off date for this practice to end." (Plaintiffs' Exhibit JJJ).

30. The City has not revoked or rescinded Ordinance No. 25, 1985.

31. The City has paid the premium reimbursement benefit to eligible police and fire-fighter retirees since the adoption of Ordinance No. 49, 1992, September 17, 1992. (Plaintiffs' Exhibit Q).

32. The City has not vetoed, disapproved or refused to pay any premium reimbursement to any eligible police and fire-fighter retirees.

33. Mr. St. Clair acknowledged that the cutoff date for this benefit would be when those retirees pass away.

34. The City has not revoked or rescinded Ordinance No. 49, 1992.

35. In April of 2003, the Council of the City of St. Bernard

15

requested the Law Director to investigate the legality of the retirement benefits provided to the retirees of the City of St. Bernard.  The Law Director concluded that he could find no statutory basis, express or implied, that would permit the City to expend public funds for either the C-9 Trust benefit or the premium reimbursement benefit.  The Law Director concluded that the expenditure of City funds did not serve a public purpose.  The Law Director cited an Ohio Attorney General opinion that the mere giving away of public funds to private persons without such persons rendering any service or providing any sort of consideration in return is clearly not the expenditure of public funds for a public purpose, but rather is the expenditure of public funds for a private purpose.  Based on this analysis, the Law Director questioned whether the C-9 Trust Fund and the premium reimbursement could properly be considered a "fringe benefit" since they were not offered as an incentive to continue one's employment with the City.  The Law Director concluded that those benefits would not be proper fringe benefits for current employees since the legislation was passed for already retired employees.

36. On May 5, 2003, Mayor Barbara Siegel, Walter St. Clair, City Auditor, and Edward Geiser, Jr., Law Director, met with the Trustees of the C-9 Trust Fund.  At that meeting, the Trustees were advised that the City of St. Bernard would not issue

16

further funds for the C-9 Trust benefit or the premium reimbursement benefit.  No retiree was given any notice, any opportunity to respond or opportunity to offer any rebuttal.

37. At the City Council meeting on October 2, 2003, Mayor Barbara Siegel stated:

> No one ever told the City of St. Bernard that we were doing something illegal or wrong with having the C-9 Trust Fund.  We were never told that.  The Auditors are here every year and we always have had a good report. So, if it was up to the Administration, in my office, it would have never been stopped because no one told us to stop it.  No one told me that anything we were doing was illegal, so let's make that very clear, and I feel that we should get both attorneys here and try to get this resolved as soon as possible because I can't believe it has gone on this long.  The City Council years ago set up this fund for the retirees and to do a good deed for the retirees, and now we are going to say it is illegal. Let's make it legal, let's get with it.  The whole City is in turmoil over this and I can't blame them a bit. They have worked for this.  So, I agree with Mr. Burkhardt that we should get this resolved as soon as possible, get whoever we have to get in here, and let's discuss it. (Plaintiffs' Exhibit RRR) (emphasis added).

## IV.  Conclusions of Law

### A.  The City Has Had Contracts with its Employees Since 1961, Reflecting Its Commitment to Provide No-Cost Medical Care

#### 1.  The City's Ordinances Are Entitled to a Presumption of Constitutionality.

The Court recognizes that all legislative enactments enjoy a presumption of constitutionality and the courts must apply all presumptions and pertinent rules of construction so as to uphold, if at all possible, a statute or ordinance.  State ex rel. Taft v. Franklin County Court of Common Pleas, 81 Ohio St. 3d 480,

17

481, 692 N.E.2d 560, 561 (1998).  In enacting an ordinance, it is presumed that Council intended a just and reasonable result, feasible of execution.

In this case, the Court presumes that when the City promulgated and passed Ordinance No. 4, 1961, it had the just and reasonable intention to provide health benefits for its current active employees who would be retiring.  The Court sees no evidence in the record that the Ordinance was illegally designed to provide retroactive benefits to already retired employees or that in fact this was the practical result.  The Court accepts the testimony of Plaintiffs as credible, that they were told on successive occasions that they had no-cost medical coverage as a part of their employment package, and that the City's course of conduct over the years indicated the City had the intent to provide no-cost medical coverage for its qualifying employees, starting in 1961. Columbus, H.V. & T Ry Co. v. Pennsylvania Co., 143 F. 757, 763 (6th Cir. 1906)("The practical interpretation given to their contracts by the parties to them while they are engaged in their performance, and before any controversy has arisen concerning them, is one of the best indicators of their true intent, and courts that adopt and enforce such a construction are not likely to commit serious error").

The Court's review of intervening Ordinances until 1985 shows that the City substituted the means to provide health

18

benefits to its employees and retirees.  However, this is not evidence of provision of a new benefit, as Defendants argue, but only reflects developments in the mechanism by which the City could meet its obligations.

In 1985, when the City passed Ordinance No. 46, 1984, it explicitly stated in the preamble that whereas it provided "medical coverage for retired employees, eligible dependents, and surviving beneficiaries," and that such coverage overlapped with state pension fund benefits, the Auditor was authorized to discontinue duplicative coverage.  A few months later, the City took this Ordinance into account when it directed the Mayor to set up the C-9 program "for the purpose of reimbursing qualified City retirees. . .for health care costs not paid by [the state plan]."  Similar to the earlier developments in the 1960's, the Court does not view these changes as the granting of a new benefit, as contended by Defendants, but rather as a modification of the means to provide an existing benefit that retirees had earned.  Indeed the Mayor at the time explained that the C-9 Trust was "to cover any added expenses you might incur due to the change in medical insurance coverage."

Although the C-9 Trust document was never executed, and the City chose to set it up by funding an account as opposed to setting up a trust, the Court finds evidence in the record showing the City incorporated the language of the trust document by reference in subsequent Ordinances, such that its terms are clearly

binding on the City.  See Ordinance No. 27, 1989 (adopting amendments both of which acknowledge that the City adopted the C-9 Trust document as of June 7, 1985).  The terms of the C-9 Trust document give the City the right to terminate the trust, after paying all benefits incurred.  The City has never taken action to terminate the trust and pay benefits incurred as required by the terms of the agreement.  The Court finds therefore that the terms of the C-9 Trust remain binding on the City.[1]

### 2. The Collectively Bargained Contracts Continued to Reflect the Provision of C-9 Benefits

With the advent of collective bargaining, the evidence shows that City employees continued to value the C-9 benefit and ensured that this benefit remained a part of their employment package.  As such, the benefit, which the City could have terminated according to its terms, continued to accrue for those new employees who continued to qualify for retirement.  The collectively bargained contracts in the record show the City agreed to maintain the C-9 Trust Fund through 2007 for fire-fighters, through 2003 for police officers, and through 2004 for service

---

[1] The Court does not find well-taken Defendants' argument that the language in the C-9 Trust document precludes beneficiaries from bringing a cause of action for its enforcement.  The language of the Trust allows for the Trustees to enforce the collection of unpaid contributions due and owing. Three of the Trustees are class members to this action.

Moreover, in the subsequent collectively bargained agreements, the City agreed to maintain the C-9 fund as solvent. The bargained agreements contained no such limitation as to their enforcement.

workers.    The agreements for the officers and service workers subsequent to 2003 and 2004 reflect the uncertainty on the part of the City as to its obligation to continue to fund the C-9, and hold the provision on maintaining the solvency of the fund in limbo pending this Court's decision on the City's obligation or lack thereof.   The Court finds that as the City has never terminated the C-9 agreement, employees and retirees originally covered by it in 1985, and employees who were employed through the present date, reasonably understood the agreement to cover them by its express terms and its incorporation into collectively bargained contracts.

Indeed, the City Law Director conceded on cross examination that any of the employees covered by collectively bargained agreements that included the C-9 language were eligible for the benefit.   Such conclusion is correct.

Having concluded the C-9 benefit is applicable to qualified employees and retirees to the present date, the Court does not find the City bound eternally by its 1985 agreement.   The terms of the agreement allow it to terminate the agreement, and should the City do so, such termination would apply prospectively, and not retroactively.   Ebert v. Stark County Board of Mental Retardation, 63 Ohio St.2d 31, 406 N.E.2d 1098 (1980)

### 3.  The Premium Reimbursement

The evidence in the record shows that service department employees were given premium reimbursement since 1961, that such

21

practice was embodied in Ordinance No. 25, 1985, and that "there is no cut-off date for this practice to end." Plaintiffs' Exhibit JJJ. The Court notes, however, that Plaintiffs proffer evidence that in their present bargaining agreement, effective May 2004, current service department employees agreed to a buy out in exchange for foregoing premium reimbursement. Plaintiffs' Exhibit VV. The Court finds no question that qualified service department employees are entitled to premium reimbursement under the 1985 Ordinance, until the time they bargained this away.

The evidence in the record also shows that in 1992 changes took place in the police and fire pension fund resulting in monthly medical premiums being deducted from the pension checks of police and fire-fighter retirees. The City passed Ordinance No. 49, 1992, providing premium reimbursement for those retirees who had retired prior to July 1, 1992. This grant of premium reimbursement was not a new benefit, but a replacement of the previously earned benefit.

**B.  Qualifying Employees Who Retired under the Ordinances or the Collectively Bargained Agreements Had a Vested Right to Health Benefits.**

The City prescribed two conditions for eligibility for the retirement benefit. The City required "present active employees" to complete "five (5) years of continuous active service immediately preceding retirement" and be "eligible for retirement benefits under" either the Police and Fire Pension Fund or PERS.

22

All class members have met those eligibility requirements.

Both the Ohio Revised Code for the pension through the Police and Fire Fund or PERS, and the relevant ordinances and the collective bargaining agreements of the City of St. Bernard narrow the substantive range of decision-making to particularized eligibility criteria. Once an employee meets those particularized standards, administrators have no discretion not to award benefits or to apply additional or alternate eligibility criteria.

The pension benefits of Ohio public employees vest, by statute, at the time when the retirement allowance or pension is granted by the retirement board. Ohio Rev. Code § 145.561. <u>Mascio v. Public Employees Retirement System of Ohio</u>, 160 F.3d 310, 313 (6th Cir. 1998). The effect of this vested rights statute is "to make the engagement of public authorities to pay a pension, upon conditions fulfilled, a contractual obligation founded upon a valid consideration, giving to the pensioner a vested right in his pension which cannot afterwards be impaired or revoked." <u>Mascio</u>, <u>Id.</u> <u>quoting</u> <u>State ex rel. Cunat v. Trustees of Cleveland Police Relief & Pension Fund</u>, 149 Ohio St. 477, 482, 79 N.E.2d 316, supplemented, 150 Ohio St. 377, 82 N.E.2d 743 (1948).

The City has tied eligibility for the retirement benefit to eligibility for a pension in the statewide pension systems without reservation. Having tied eligibility for the retirement benefit to eligibility in the statewide pension systems without a

23

reservation of right to terminate that benefit, the City has made the retirement benefit a contractual obligation founded upon valid consideration, giving the retirees a vested right which cannot afterwards be impaired or revoked. <u>Mascio</u>, <u>Id</u>. quoting <u>State ex rel. Cunat v. Trustees of Cleveland Police Relief & Pension Fund</u>, 149 Ohio St. 477, 482, 79 N.E.2d 316, supplemented, 150 Ohio St. 377, 82 N.E.2d 743 (1948).

The ordinances and bargained contracts of the City speak in compulsory terms. "[T]his benefit <u>shall</u> be applicable. . . upon their retirement"; or "the City agrees to maintain and assume responsibility for the solvency"; or the "City shall reimburse qualified City Retirees". This mandatory language in the ordinances and contracts creates a legitimate claim of entitlement to the retirement benefit in the Retirees.

In both Ordinance No. 25, 1985 and Ordinance No. 49, 1992, the Council <u>directed</u> the Auditor to pay the premiums for health insurance deducted from pension checks. In each of the bargained contracts, the City agreed to "maintain and assume responsibility for the solvency of the C-9 Trust Fund." The City did not limit or restrict that obligation.

In addition to the mandatory language of the ordinances and bargained contracts, the City has acknowledged the retirement benefit to be a vested right. In its recent negotiations with PERS employees, it agreed to buy out their right to premium

24

reimbursement in exchange for cash payments.

The claim of entitlement in this case is bolstered by the nature of the benefit at stake.  The right to this retirement benefit arises by virtue of past labor services.  The retirement benefit was offered to "present active employees" as compensation for their dedicated and loyal service.  Once the retirees met the eligibility requirements, they had earned the right to receive the benefit.  Here the City created a vested right to the retirement benefit both by design and contract.

Having reviewed this matter, the Court finds the record shows class members had a vested right to the retirement benefits in dispute.  The provision of such retirement benefits serves the public purpose of providing benefits to public employees who earned them.  The City's actions in withholding payments amount to a breach of the City's contract with its employees.

**C. The Deprivation of the Vested Property Right Here Rises to the Level of a Constitutional Violation of Plaintiffs' Substantive Due Process Rights.**

A violation of substantive due process rights can be established by showing either the "denial of a right, privilege or immunity secured by the Constitution or by federal statue" or an official act which "'shocks the conscience' of the court." <u>Mertik v. Blalock</u>, 983 F.2d 1353, 1367-1368 (6th Cir. 1993).  Here, the City ended a history of forty-two years paying a retirement benefit that had been promised, assured, contracted, confirmed and earned.

Despite the history, the promises, the representations, the finding of the Business & Industry Committee, and the urgings of the Mayor, the Council suspended all benefits to all retirees. Such conduct shocks the conscience of the Court.

The Court further finds that Plaintiffs have adequately established a due process violation of a constitutionally protected property interest, because they have shown that governmental conduct deprived them of a right previously held under state law. Whaley v. County of Tuscola, 58 F.3d 1111, 1113-1114 (6th Cir. 1995), cert. denied 516 U.S. 975 (1995). As the Supreme Court has explained, "property interests. . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law − − rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Roth, 408 U.S. at 577.

The City cites Charles v. Baesler, 910 F.2d 1349 (6th Cir. 1990) for the proposition that "most, if not all, state-created contract rights, while assuredly protected by a procedural due process, are not protected by substantive due process" because "the substantive Due Process Clause is not concerned with the garden variety issues of common law contract." Id. at 1353. However, the scope of substantive due process protections with respect to property rights turns not on the availability of state contract remedies, but on whether "liberty and justice are

26

threatened, in the constitutional sense, by the failure of the government and its officials to abide by their contract." Id. at 1353.

The City trivializes the deprivation in this case as a loss of a finite interest that can be compensated merely by an ordinary breach of contract action.  At trial Defendants invoked Bacher v. City of North Ridgeville, No. 94-4338, 1996 U.S. App. LEXIS 14495 (May 14, 1996, 6th Cir.), for the proposition that the benefits at stake here do not involve interests implicating substantive due process.  The Defendant further relied on Ramsey v. Board of Education, Whitley Co., Ky, 844 F.2d 1268 (6th Cir. 1988), a case in which the Sixth Circuit found a dispute involving the reduction of sick leave benefits belonged in state court (doc. 43). The Court does not find these authorities on point, as the benefits at issue here are of greater significance than those at issue in cited authorities.

"The Supreme Court has held repeatedly that the property interests in a person's means of livelihood is one of the most significant that an individual can possess." Ramsey, 844 F.2d at 1273 citing Cleveland Board of Education v. Loudermill, 470 U.S. 532, 543 (1985).  The Court cannot accept the dimunition of the retirement benefit as a finite loss.  For thirty years on average, the Retirees provided loyal, dedicated and, at times life-threatening, service to the City.  In addition to the heart-felt

thanks of the citizenry of St. Bernard, these Retirees gave that dedicated service with the reasonable expectation that their retirement from City service would bring a pension and medical benefits. By its actions, the City is effectively taking some part of the years of service of each Retiree. This deprivation causes more than the loss of premium reimbursement and C-9 Trust Fund reimbursement. The Retirees also suffer the social stigma of having the City diminish the value of their public service, reduce the amount of the pension available, and the loss of economic autonomy their public careers were expected to provide.

**D. Defendants' Actions Amount to an Impairment of Plaintiffs' Contract Rights in Violation of the Contract Clauses of Article 1, Section 10 of the United States Constitution, and Section 28, Article II of the Ohio Constitution**

The Contract Clause of the Constitution provides that "no state shall. . .pass any. . .law impairing the obligation of contracts." U.S. Const. Art. I, § 10, Cl. 1. The language of the Ohio Constitution is virtually identical to the Contract Clause of the United States Constitution. Ohio courts addressing claims under the Ohio Constitution generally look to federal law under the Contract Clause. Consequently, an impairment of contract under the United States Constitution is also an impairment under the Ohio Constitution. The Contract Clause applies to actions of state subdivisions, including municipalities and City Councils.

To prove a violation of the Contract Clause, a plaintiff must demonstrate that a "change in state law has 'operated as a

28

substantial impairment of a contractual relationship.'" Mascio v. Public Employment Retirement System of Ohio, 160 F.3d 310, at 313 (6th Cir. 1998), quoting General Motors Corp v. Romein, 503 U.S. 181, at 186 (1992). "In deciding whether such a demonstration has been made, the court must ask whether (1) a contract exists, (2) a change in law impairs that contract, and (3) the impairment is substantial." Mascio, Id., quoting Linton v. Comm'r of Health & Environment, 65 F.3d 508, 518 (6th Cir. 1995), cert. denied, 517 U.S. 1155 (1996). "If a contractual obligation is substantially impaired by the change in law, the court must further inquire whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in the service of a legitimate and important public purpose." Mascio, Id. "Where the State is a party to the contractual obligation in question, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." Mascio, Id. at 315, quoting United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 26 (1977). "Moreover, a state is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives." Id.

The Court has already found that a contract exists in this case, such that the City's actions constituted a breach of its promise to provide certain benefits. The City argues that it

passed no law, but "suspended" payment of benefits upon the legal opinion of the Law Director. The City's argument is not well-taken. Council exercised its legislative power to effect policy blocking payment of benefits to class members. There is no question as far as the Court is concerned that a change in law impaired the class members' contractual rights. The Court further finds, in the light of all the facts articulated above, such impairment is substantial, and in violation of Article I, Section 10 of the United States Constitution. The Association of Pennsylvania State College and University Faculties v. State System of Higher Education, 479 A.2d 962 (Pa. 1984). The Court further notes that such impairment was not reasonable and appropriate in the service of a legitimate and important public purpose. Mascio, 160 F.3d 310.

**E. The Plaintiffs Were Denied a Fair Hearing in Violation of Constitutional Due Process**

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving individuals of life, liberty or property without due process of law. "To establish a due process violation, a plaintiff must first establish a deprivation of life, liberty or property, and then, that the afforded process was less than that due." See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 352, 541 (1985).

In determining whether the afforded process in a particular case comported with due process, three factors must be

30

balanced: "first, the private interest that will be affected by the official action, second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interests." <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335 (1976).

Here the Court determines that the class members were deprived of a substantial vested property interest in their retirement benefits. <u>Perry v. Sindermann</u>, 408 U.S. 593, 601 (1972). The Court next turns to what process was due. "When a plaintiff has a protected property interest, a predeprivation hearing of some sort is generally required to satisfy the dictates of due process." <u>Leary v. Daeschner</u>, 228 F.3d 729, 742 (6th Cir. 2000), <u>Mallette v. Arlington County Employees' Supplemental Retirement System II</u>, 91 F.3d 630, at 640 (4th Cir. 1996)("At a minimum, the Constitution requires notice and some opportunity to be heard"), <u>citing</u> <u>Joint Anti-Fascist Refugee Comm. v. McGrath</u>, 341 U.S. 123, 178 (1951).

The facts of this case show the City elected to suspend all benefits to all retirees without any individualized consideration. The Council, the Administration and the Law Director did not offer any retiree the opportunity to demonstrate the legitimacy or validity of the retirement benefit to which he or she was entitled. The Council, the Administration and the Law

Director treated all employees alike despite the fact that some of the retirees had retired under the terms of a bargained contract which clearly and unquestionably described retirement benefits that would be available upon retirement.

The retirees had a strong interest in their benefits. The City's massive, unilateral termination of the retirement benefit resulted in an unacceptable likelihood of error. "The risk of an inaccurate and unfair deprivation mounts when decisionmaking is one-sided." Mallette, 91 F.3d at 641 citing McGrath, 341 U.S. at 170.

Had the City simply provided each retiree with an opportunity to be heard before suspending the retirement benefit, the City could have addressed the legal issues with which they were concerned while preserving the property rights to which the retirees were rightfully entitled.  The City was concerned with the origin of each retiree's benefit.  A pre-deprivation hearing could have addressed that issue.  Two simple questions could have been asked, 1)"What retirement benefits are you entitled to" and, 2)"What source do you claim for that benefit?"

With the answer to those questions, rights could have been preserved, issues could have been narrowed and resolution facilitated.  Consequently, many retirees claiming benefits through the bargained contracts would not have had to suffer the loss of those benefits.  The City would not have been unduly burdened by

32

providing such a predeprivation hearing. <u>Mallette</u>, 91 F.3d at 641. For all of these reasons, the Court concludes that the City violated the procedural due process rights of the class.

**F. Plaintiffs' Claims for Promissory Estoppel Fail as a Matter of Ohio Law**

Defendants correctly indicate that the Ohio Supreme Court's decision in <u>Hortman v. City of Miamisburg</u>, 110 Ohio St.3d 194, 852 N.E. 2d 716 (Ohio 2006) precludes Plaintiffs' claims based on the theories of promissory and equitable estoppel. In <u>Hortman</u>, the Ohio Supreme Court held that these doctrines "are inapplicable against a political subdivision when the political subdivision is engaged in a governmental function." <u>Id</u>. at 199. The Court understands the management of retirement fund benefits by a municipality to fall within the realm of a government function.

**G. Plaintiffs' Claims for Breach of Fiduciary Duties, Unjust Enrichment, and Breach of the Moral Obligation Doctrine Fail**

Plaintiffs did not assert their claims for breach of fiduciary duty, unjust enrichment, or breach of moral obligation doctrine in their Amended Complaint. Nor were these claims listed in the Joint Final Pretrial Order. The Court finds well-taken Defendants' argument that for these reasons, the claims should be dismissed. <u>Moore v. Fenex, Inc.</u>, 809 F.2d 297, 301 (6th Cir. 1987).

**V. Conclusion**

Having reviewed this matter, the Court concludes that the City's actions in this matter, based on the erroneous application

of a legal principle, resulted in a breach of contract with class members that rises to constitutional proportions.  The Court finds the City violated class members' substantive due process rights because its actions shock the conscience of the Court, and because the City deprived class members of a substantive property interest. The Court further finds the City's policy of suspending payment of benefits amounted to an impairment of contract rights in violation of the Contract Clauses of Article 1, Section 10 of the United States Constitution, and Section 28, Article II of the Ohio Constitution, and that the City's failure to provide any predeprivation hearing amounts to a violation of procedural due process.  The Court exercises supplemental jurisdiction over Plaintiffs' state law claims, 28 U.S.C. § 1367(a), and finds that the City breached its contractual duties to the class, violated the Ohio Constitution, and the laws of the state of Ohio.  The Court however DISMISSES Plaintiffs' claims for promissory and equitable estoppel, as inconsistent with Ohio law, and DISMISSES Plaintiffs' Claims for Breach of Fiduciary Duties, Unjust Enrichment, and Breach of the Moral Obligation Doctrine, for failure to include them in their Amended Complaint or Final Pretrial Order.

In accordance with the Opinion expressed herein, the Court ENTERS Judgment for Plaintiffs on Counts One through Five of their Amended Complaint, and for Defendant on Count Six of the Amended Complaint, ORDERS Defendant to restore, in conformity with

34

this Opinion, the benefits it has withheld, and CONTINUES this matter until 10:00 A.M. on January 31, 2007, for a hearing on the relief to be accorded, including damages, costs, and related matters.


        SO ORDERED.

Dated: November 22, 2006        s/S. Arthur Spiegel
                                S. Arthur Spiegel
                                United States Senior District Judge